UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GARY WILLIAMS,

                 Petitioner,                                     Hon. Robert J. Jonker

v.                                                    Case No. 1:10-CV-998

CINDI CURTIN,

                 Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Williams' petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Williams' petition be **denied**.


## BACKGROUND

        As a result of events which occurred on or about October 30, 2004, Petitioner was charged with: (1) felony murder; (2) armed robbery; (3) possession of a firearm during the commission of a felony; and (4) possession of a firearm by a felon. (Trial Transcript, June 7, 2005, 11-12, 28-29). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**William Bradshaw**

As of October 30, 2004, Bradshaw was employed as a patrolman for the Benton Township Police Department. (Trial Transcript, June 8, 2005, 226-27). At approximately 1:27 a.m. that morning, Bradshaw was dispatched to investigate a report of an armed robbery and shooting at the Domino's Pizza located on Napier Avenue in Benton Township. (Tr. 227). When Bradshaw arrived at the scene, he observed Orational Lewis standing next to a nearby vehicle and "jumping up and down." (Tr. 228-29). Lewis "pointed in the backseat of his vehicle" where Isaac Washington lay. (Tr. 229). Bradshaw observed that Washington had suffered an abrasion to his forehead, as well as a gunshot wound in the right hip area. (Tr. 229). Washington told Bradshaw that he had been shot by "a black male, approximately five-five, wearing a white T-shirt and black jeans." (Tr. 230). Bradshaw subsequently entered the Domino's Pizza building and retrieved a videotape from the store's surveillance system. (Tr. 233-34).

**Blake McKinney**

As of October 30, 2004, McKinney was employed as a police officer for the Benton Township Police Department. (Trial Transcript, June 8, 2005, 237-38). At approximately 1:27 a.m. that morning, McKinney was dispatched to the Napier Avenue Domino's Pizza location. (Tr. 238). McKinney arrived at the location shortly after Officer Bradshaw. (Tr. 238-39). McKinney subsequently entered the Domino's Pizza building where he discovered "a spent shell casing from a 380 caliber" weapon and "a I-710 Nextel Motorola cell phone." (Tr. 240-42). An investigation of the telephone revealed the number assigned to the phone (269-876-8849), as well as a list of the recent incoming, outgoing, and direct-connect calls made with the phone. (Tr. 257-59). In further

investigation of the facility, McKinney observed that the time displayed on the surveillance system was "28 minutes slower than the actual present time." (Tr. 255-56). Approximately one hour after arriving at the crime scene, McKinney departed to locate Darius Kyle, the manager of this particular Domino's Pizza location. (Tr. 264-66).

**Eric Haskins**

As of October 30, 2004, Haskins was employed as a police officer for the Benton Township Police Department. (Trial Transcript, June 8, 2005, 275). Early that morning, Haskins was dispatched to assist with the investigation of an armed robbery and homicide at the Napier Avenue Domino's Pizza location. (Tr. 275). Near this location, Officer Haskins discovered a white T-shirt "about six feet up in a tree." (Tr. 275-76). Haskins informed Lieutenant Delmar Lange who recovered the T-shirt and logged it into evidence. (Tr. 276).

**Delmar Lange**

As of October 30, 2004, Lange was employed as a police officer for the Benton Township Police Department. (Trial Transcript, June 8, 2005, 275). Early that morning, Lange was dispatched to the Napier Avenue Domino's Pizza location to assist in the investigation of a robbery and shooting. (Tr. 277-78). Upon arriving at the scene, Lange recovered a white T-shirt which had been discovered hanging in a nearby tree. (Tr. 278-79). Lange then proceeded to investigate the interior of the Domino's Pizza store where he recovered an apron, another shirt, and several potential fingerprints. (Tr. 279-86).

**Al DeBrito**

As of October 30, 2004, DeBrito was employed as a Special Agent with the Federal Bureau of Investigation. (Trial Transcript, June 8, 2005, 297). Early that morning DeBrito was dispatched to the Napier Avenue Domino's Pizza location to assist in the investigation of a robbery and homicide. (Tr. 297). When DeBrito arrived at the scene he assisted the police with obtaining the "subscriber information" for the Nextel phone recovered from the scene. (Tr. 297-98). DeBrito was able to communicate with a Nextel representative who provided DeBrito was the requested information which DeBrito communicated to the police. (Tr. 298).

**James Young**

As of October 30, 2004, Young was employed as a Detective Sergeant with the Technical Services Unit of the Michigan State Police. (Trial Transcript, June 8, 2005, 303). Young was asked to analyze the surveillance videotape recovered from the Napier Avenue Domino's Pizza on October 30, 2004. (Tr. 305-06). Young received a copy of the surveillance tape from which he was able to recover several still images. (Tr. 306-13).

**Gregory Abrams**

As of October 30, 2004, Abrams was employed as a police officer for the Benton Township Police Department. (Trial Transcript, June 8, 2005, 315). Early that morning, Abrams was dispatched to a local hospital to obtain a statement from Isaac Washington. (Tr. 315-16). By the time Abrams arrived at the hospital, however, Washington had passed away. (Tr. 316).

**Brian Smit**

As of November 1, 2004, Smit was employed as a police officer for the Benton Township Police Department. (Trial Transcript, June 8, 2005, 325). On this date, Smit was present at the autopsy of Isaac Washington. (Tr. 325). As part of the autopsy, fingernail clippings and a blood sample were recovered from Washington. (Tr. 325-26). These items were provided to Smit, who transported them to the crime lab for analysis. (Tr. 326).

**Kalisha Pierce**

Pierce is Petitioner's aunt. (Trial Transcript, June 8, 2005, 331). Pierce's nickname is Sookie and Petitioner's nickname is Pooh Bear. (Tr. 331). On October 30, 2004, at approximately 5:30 p.m., police officers arrived at Pierce's residence. (Tr. 332). The officers were attempting to locate Petitioner who, unbeknownst to the officers, was presently in the upstairs portion of Pierce's residence. (Tr. 332-33). When the officers asked if they could search Pierce's residence, Pierce initially refused. (Tr. 332). The officers responded that they would wait outside while they obtained a warrant. (Tr. 332-33). A short while later, Pierce agreed to allow the officers to search her residence. (Tr. 332-33). By this time, however, Petitioner had escaped by exiting through an upstairs window. (Tr. 333). Pierce subsequently learned that Petitioner fled to South Bend, Indiana, and later Georgia, where he was eventually captured. (Tr. 337-39).

**Betty Phillips**

Phillips is Petitioner's grandmother. (Trial Transcript, June 8, 2005, 350). On the afternoon of October 30, 2004, police officers arrived at Phillips' residence looking for Petitioner.

(Tr. 353). Phillips informed the officers that she had not seen Petitioner since the previous day. (Tr. 353). Shortly after the officers departed, Petitioner telephoned Phillips who instructed Petitioner to contact the police. (T. 354).

**Joel Service**

As of October 30, 2004, Service was employed as a Trooper for the Michigan State Police. (Trial Transcript, June 8, 2005, 358). Specifically, Service worked as a canine handler with Nemo, a German Shepherd. (Tr. 358-61). On October 30, 2004, Service was dispatched to the Napier Avenue Domino's Pizza and instructed to "track down a suspect." (Tr. 360). Nemo was presented with the T-shirt that had been located in a nearby tree, but Nemo "showed no interest in the T-shirt whatsoever." (Tr. 362). Nemo nevertheless picked up a scent and tracked it to the vicinity of the Briarwood apartment complex, but was then "unable to pick up any further track." (Tr. 360-62).

**Brett Johnston**

As of December 1, 2004, Johnston was employed as a police officer for the Benton Township Police Department. (Trial Transcript, June 8, 2005, 370-71). On that date, Johnston made a copy of the surveillance videotape recovered from the Napier Avenue Domino's Pizza location on the morning of October 30, 2004. (Tr. 371-75). On May 18, 2005, Officer Johnston was instructed by Detective DeLand to make a copy of a surveillance videotape from a Red Roof Inn recorded the night of October 29, 2004 and early morning of October 30, 2004. (Tr. 376-78). A review of this tape revealed that at approximately 12:50 a.m., an individual entered the lobby of the Red Roof Inn

and placed a telephone call.  (Tr. 380).

**Crystal Evans**

Evans is the mother of one of Petitioner's children.  (Trial Transcript, June 8, 2005, 383).  Evans saw Petitioner at his grandmother's residence on October 28, 2004.  (Tr. 383).  Evans was unsure whether Petitioner was carrying his cell phone at the time.  (Tr. 383).  At approximately 5:00 p.m. on October 29, 2004, Petitioner called Evans to ask for money.  (Tr. 384).  Evans drove to Petitioner's location and gave him twenty dollars.  (Tr. 385).  Evans was unsure whether Petitioner and Leon Lewis were acquainted.  (Tr. 385).

**Joseph Williams**

As of October and November 2004, Williams owned a cell phone, the number for which was 287-0589.  (Trial Transcript, June 8, 2005, 387).  Williams was unsure what Petitioner's cell phone number was at the time, but indicated that 269-876-8849 "sound[ed] like [Petitioner's] cell phone number."  (Tr. 387-88).  Williams was unsure whether he telephoned Petitioner on October 30, 2004, but indicated that he "probably did" because he used to call Petitioner "a lot."  (Tr. 388).

**Josette Hodges**

Hodges was employed as a customer service specialist for Nextel.  (Trial Transcript, June 8, 2005, 275).  As part of the investigation into the robbery and murder of Isaac Washington, Hodges was asked to identify the account holder for cell phone number 269-876-8849.  (Tr. 393-94).

Hodges identified the account holder as Alvin Meridy.  (Tr. 393-94).

### Dr. Christopher Prince

On the early morning of October 30, 2004, Dr. Prince was working as an emergency room physician at Lakeland Hospital.  (Trial Transcript, June 8, 2005, 414).  At approximately 1:43 a.m. that morning, Isaac Washington was transported by ambulance to the Lakeland emergency room.  (Tr. 415).  Dr. Prince observed that Washington had four gunshot wounds "in the hip, groin, and both upper thighs."  (Tr. 417).  Washington was unconscious when he arrived at the hospital.  (Tr. 417).  Dr. Prince was unable to revive Washington and he was pronounced dead at 1:54 a.m.  (Tr. 417-18).

### Barbara Meeks

Meeks owns the Napier Avenue Domino's Pizza in Benton Township that was robbed on October 30, 2004.  (Trial Transcript, June 8, 2005, 419-20).  At the time of the robbery, three employees were scheduled to be working: (1) Isaac Washington; (2) Orational (a.k.a. Leon) Lewis; and (3) Darius Kyle, an assistant manager.  (Tr. 420).  This particular Domino's location had a safe in which "large bills" and other money was stored.  (Tr. 422-25).  Meeks and two other individuals, including Darius Kyle, knew the combination to the store's safe.  (Tr. 424).  On the night in question, one-thousand nine-hundred three dollars ($1,903.00) was stolen.  (Tr. 426).  Meeks indicated that the door to the side entrance of the store did not always close completely.  (Tr. 422).

As of the night of the robbery, Orational Lewis had been working at this particular Domino's for approximately eight months.  (Tr. 421).  Lewis' paychecks were garnished by the

Friend of the Court to satisfy his child support obligations. (Tr. 428-29). While only fifty percent of Lewis' pay was supposed to be garnished, his first several paychecks were mistakenly garnished in full due to a payroll mistake by Domino's. (Tr. 428-29).

**Alvin Meridy**

In October 2004, Alvin Meridy's sister, Charleccia Meridy, opened a cell phone account for Petitioner using Alvin Meridy's name. (Trial Transcript, June 8, 2005, 431-33). Alvin Meridy did not learn of this occurrence until after the account had been opened. (Tr. 431-32). Because he did not want to pay the $400 fee to cancel the account in question, Meridy agreed to allow Petitioner to keep the account provided he pay the monthly bill. (Tr. 433-34). The phone number assigned to the account that Charleccia Meridy opened for Petitioner was 269-876-8849. (Tr. 434). At approximately 9:30 a.m. on October 30, 2004, Petitioner contacted Meridy and informed him that he lost his phone the previous evening. (Tr. 435-36).

**Lisa Smith-Bradshaw**

As of October 30, 2004, Smith-Bradshaw was employed as a crime scene technician for the Benton Township Police Department. (Trial Transcript, June 8, 2005, 447-48). Early that morning, she was dispatched to the Napier Avenue Domino's Pizza location to help process the crime scene and recover evidence. (Tr. 448). As part of her efforts, Smith-Bradshaw observed a shoe print which she tried to recover. (Tr. 448-49). She also recovered several latent fingerprints from throughout the Domino's location. (Tr. 448-55).

**Dr. Stephen Cohle**

Dr. Cohle was permitted to testify as an expert in the field of forensic pathology. (Trial Transcript, June 9, 2005, 469-70). Dr. Cohle performed an autopsy of Isaac Washington on November 1, 2004. (Tr. 470). This examination revealed that Washington had been shot in the left thigh causing a major artery in the thigh to sever causing Washington's death. (Tr. 470-74). The doctor concluded that Washington's death was a homicide. (Tr. 474).

**Darius Kyle**

As of October 29, 2004, Kyle was employed as the assistant manager at the Napier Avenue Domino's Pizza location. (Trial Transcript, June 9, 2005, 481). Kyle was on duty this particular evening, along with Issac Washing and Leon Lewis. (Tr. 481-82). At "around midnight," Lewis departed the store to deliver a pizza to a nearby Red Roof Inn. (Tr. 483-84). After Lewis departed, Kyle and Washington entered the office to count money and prepare to close for the night. (Tr. 485-86). A short time later, Kyle heard the "beep" signaling that somebody had entered the restaurant. (Tr. 486-87). All three doors into the restaurant were equipped to "beep" when opened, so Kyle did not know which door had been opened, but he assumed it was Lewis returning to the restaurant through the side door. (Tr. 486-89).

Instead, a black man wearing a "Scream mask" and gray hooded sweatshirt entered the office. (Tr. 489-93, 529). The man was brandishing a handgun and instructed Kyle and Washington to "get down on the floor." (Tr. 489-94). Kyle stated that he was five feet ten inches tall and weighed one hundred forty pounds and that the robber was "about [his] size." (Tr. 495-96). Kyle also observed that the robber was carrying a cell phone. (Tr. 501-02). The robber instructed

Kyle to give him the delivery drivers' money as well as the money from the safe. (Tr. 496-500). Kyle complied with this instruction after which the robber instructed Kyle to remove the videotape from the surveillance system. (Tr. 496-501). Kyle was unable to remove the videotape from the machine, however. (Tr. 500-02).

While Kyle was attempting to remove the videotape, the restaurant's telephone began to ring. (Tr. 502). The robber instructed Kyle to answer the phone and "act normal." (Tr. 502-03). As Kyle was speaking with a customer on the telephone, Washington "rushed the robber." (Tr. 503). Washington and the robber began struggling for the robber's weapon. (Tr. 503-04). At this point, Kyle attempted to trigger the silent alarm, but "the key broke." (Tr. 505). Kyle was unsure if the alarm had been actually been triggered. (Tr. 505). Kyle then departed the restaurant "to try to get help." (Tr. 506). As Kyle was exiting the store, he heard the robber say, "you done fucked up now," immediately after which he heard a noise that "sounded like a firecracker." (Tr. 506-08). Kyle ran to nearby houses to get help, without success. (Tr. 508-11). Kyle then ran to a nearby gas station where he telephoned the police. (Tr. 511-12).

**James Pierson**

As of October 30, 2004, Pierson was employed by the Michigan State Police as the Supervisor of the latent fingerprint unit at the Grand Rapids forensics laboratory. (Trial Transcript, June 9, 2005, 578). Pierson was permitted to testify as an expert in the field of fingerprint identification. (Tr. 579-80). Following the October 30, 2004, robbery and murder at the Napier Avenue Domino's Pizza, Pierson was provided with a shell casing that had been recovered at the crime scene. (Tr. 580-81). Believing that he was unlikely to retrieve a fingerprint from the shell

casing, Pierson instead swabbed the shell casing in an attempt to recover a DNA sample. (Tr. 581-82). Pierson was also provided nine finger/palm prints that had been recovered from the crime scene. (Tr. 582-83). Of these, only two fingerprints and one palm print were of sufficient quality to analyze. (Tr. 583-84). Pierson was unable to identify from whom these particular prints originated. (Tr. 583-86). Pierson was also provided a cell phone from Detective DeLand for forensic processing. (Tr. 586). Again, believing it unlikely that any usable fingerprints could be recovered from such small surfaces, Pierson instead processed the phone in an attempt to obtain a DNA sample. (Tr. 586-88).

**Ann Hunt**

As of October 30, 2004, Hunt was employed by the Michigan State Police in the biology DNA unit of the Grand Rapids forensics laboratory. (Trial Transcript, June 9, 2005, 592). Hunt was permitted to testify as an expert in the field of DNA identification. (Tr. 595). Hunt analyzed the DNA retrieved from the cell phone recovered from the crime scene and concluded that "the DNA types on the cell phone were consistent with a mixture of two or more" donors. (Tr. 599-601). Hunt further concluded that "the major donor, or the person who contributed the most DNA on that cell phone, that profile matched the profile of [Petitioner] at all 13 loci." (Tr. 601).

**Steven McCullough**

As of November 11, 2004, McCullough was employed as an Investigator with the Dekalb County Sheriff's Office in Atlanta, Georgia. (Trial Transcript, June 9, 2005, 619). Specifically, McCullough was assigned to the department's "fugitive squad." (Tr. 619). On this

particular date, McCullough learned that Petitioner was residing within his jurisdiction. (Tr. 620). McCullough apprehended Petitioner along with "several duffle bags full of clothes" that were in his possession. (Tr. 620-21). One of the items of clothing in the dufflebags was a gray hooded sweatshirt. (Tr. 621-22). Petitioner also had in his possession, a Greyhound ticket indicating that he traveled from Indianapolis to Atlanta on November 4, 2004. (Tr. 623-25).

**James Zucker III**

As of November 22, 2004, Zucker was employed as the head technician for Wireless Land. (Trial Transcript, June 9, 2005, 628-29). On this date, Detective DeLand requested that Zucker retrieve the information from a particular cell phone. (Tr. 629-30). Zucker was able to retrieve the internal phone book from the cell phone in question. (Tr. 629-31).

**Cathleen Kuplic**

As of October 30, 2004, Kuplic was employed as a paramedic for Medic 1 Ambulance. (Trial Transcript, June 9, 2005, 634). In the early morning hours of October 30, 2004, Kuplic was dispatched to the Napier Avenue Domino's Pizza to treat a gunshot victim. (Tr. 634-35). When Kuplic arrived on the scene, Isaac Washington was conscious, but was nevertheless in "bad" shape. (Tr. 635). Kuplic immediately transported Washington to Lakeland hospital. (Tr. 636-37).

**Jameel McGee**

On the evening of October 29, 2004, McGee hosted a party at his residence at 690 McGuigan. (Trial Transcript, June 9, 2005, 655-56, 659-60). McGee's residence is located

approximately five miles from the Napier Avenue Domino's Pizza location. (Tr. 655-56, 659-60). At least 30 people, including Petitioner, attended this party. (Tr. 656). Petitioner arrived at the party "a little after" 11:00 p.m. (Tr. 657). Petitioner was wearing dark blue jeans and a gray hooded sweatshirt. (Tr. 660). After arriving at the party, Petitioner began gambling with others, but did not fair very well. (Tr. 658-59). Petitioner had his cell phone and, at one point, let somebody borrow it, but the phone was returned to Petitioner before he left the party. (Tr. 660-62). Petitioner departed McGee's residence "about 12:30, somewhere in there." (Tr. 659).

Petitioner returned to McGee's residence "around" 2:00 a.m. in the company of a man named "Tank." (Tr. 663). Upon returning to the party, Petitioner, who now had "a nice little wad of money," resumed gambling. (Tr. 664-65). McGee observed that Petitioner had "went and got some more money." (Tr. 664). Petitioner was still wearing blue jeans and a gray hooded sweatshirt. (Tr. 665). However, when somebody later asked Petitioner if they could use his cell phone, Petitioner responded that "he ain't got it, he lost his phone." (Tr. 665). Petitioner remained at McGee's party until approximately 3:00 a.m. (Tr. 665-66).

**Tom Vaught**

As of October 30, 2004, Vaught was employed as a police officer for the Benton Township Police Department. (Trial Transcript, June 10, 2005, 695). Early that morning, Vaught was dispatched to the Napier Avenue Domino's Pizza location to assist in the robbery and murder investigation. (Tr. 695). After Alvin Meridy was contacted, Vaught and others began searching for Petitioner. (Tr. 702-03). This search eventually led officers to Kalisha Pierce's residence. (Tr. 703-04). Pierce was uncooperative, but eventually allowed officers to search her house for Petitioner.

14

(Tr. 704-05). By this time, however, Petitioner had escaped through an upstairs window. (Tr. 705).

On October 31, 2004, Vaught was informed that Charleccia Meridy wanted to speak with him. (Tr. 706-07). Vaught and Lieutenant O'Brien met and spoke with Meridy. (Tr. 707). During their conversation, Meridy referred to a person she knew as Pooh Bear. (Tr. 710). As a means of identifying Pooh Bear, Vaught requested that Meridy participate in a photographic line-up procedure. (Tr. 708). Meridy agreed and identified Petitioner as the person she knew as Pooh Bear. (Tr. 708-10). The following day, Vaught met with Petitioner's grandmother, Betty Phillips, in an attempt to obtain "some family history" that might be helpful in capturing Petitioner. (Tr. 710).

Subsequent investigation of the telephone numbers contained in Petitioner's cell phone revealed that one of the numbers was assigned to the "lobby phone" at a local Red Roof Inn and another number was assigned to a pay phone at a Sunoco gas station located at 1117 Pipestone in Benton Township. (712-20, 736, 827-28).

**James Pryor**

As of October 30, 2004, Pryor lived "right behind" the Napier Avenue Domino's Pizza location. (Trial Transcript, June 10, 2005, 730). At approximately 1:30 a.m. that morning, Pryor was awakened by somebody knocking on his door. (Tr. 730-33). Pryor answered his door, but because he was "pretty much asleep" he was unable to determine what the man wanted at which point the man simply "walked off." (Tr. 730-33).

**Steven Cook**

As of November 2, 2004, Cook was employed as the manager of the Benton Harbor

Red Roof Inn. (Trial Transcript, June 10, 2005, 736). On this date, Cook spoke with Officers Smit and DeLand concerning events of October 29-30, 2004. (Tr. 736). Cook informed the officers that on the night in question, Terrance Davis was staying in room 148 and Curt Tingue was working as the desk clerk. (Tr. 737-38). Cook also provided the officers with the video surveillance tape from the night in question. (Tr. 738-39). Cook indicated that on the night in question the time indicated on the Inn's video surveillance system was approximately 60-75 minutes behind the correct time. (Tr. 740).

**Curt Tingue**

On the night of October 29-30, 2004, Tingue was working as the front desk clerk at the Benton Harbor Red Roof Inn. (Trial Transcript, June 10, 2005, 743). At approximately 12:30 a.m. on October 30, 2004, a Domino's Pizza delivery person arrived at the Inn and asked to use the telephone. (Tr. 744-45). Tingue consented and the man placed a call after which he "walked out to his vehicle" and departed. (Tr. 744-47).

**Dajaun Rimpson**

On the night of October 29, 2004, Rimpson attended a party at his brother Jameel's residence on McGuigan Street. (Trial Transcript, June 10, 2005, 751-52). Petitioner arrived at the party at approximately 11:30 p.m. and was wearing jeans and a gray hooded sweatshirt similar to the sweatshirt Petitioner had in his possession when he was captured in Georgia. (Trial Transcript, June 9, 2005, 621-22; Trial Transcript, June 10, 2005, 753-56, 760). After arriving at the party, Petitioner began gambling, without success. (Trial Transcript, June 10, 2005, 753-55). Approximately 30-40

minutes after arriving, Petitioner exited the party. (Tr. 756). At approximately 2:00 a.m., Petitioner returned to the party. (Tr. 756). Petitioner was wearing the same clothes, but now had "a lot" of money which he used to resume gambling. (Tr. 757-58).

**Nikki Stewart**

As of October 30, 2004, Stewart resided at 818 Buss Street. (Trial Transcript, June 10, 2005, 797-98). At approximately 4:00 a.m. that morning, Petitioner arrived at Stewart's residence and asked to use her telephone. (Tr. 798-800, 803). Stewart acceded after which Petitioner placed three telephone calls, one of which was to his own cell phone. (Tr. 800-02).

**Nichole Landry**

Landry indicated that her maiden name was Childs, but that she now used her married name of Landry. (Trial Transcript, June 10, 2005, 805-06). Landry spent the evening of October 29, 2004, with her friend, Passion Wallace, at Wallace's residence. (Tr. 805-07). At approximately 11:00 p.m. that evening, Leon Lewis telephoned Wallace. (Tr. 807). Landry answered the phone and spoke with Lewis, who asked Landry "to make a three-way call" with another man whose voice Landry did not recognize. (Tr. 807-11). Once the connection between Lewis and the other man was established, Landry "set the phone down" and did not listen to their conversation. (Tr. 808-09).

**Chennell Williams**

As of October 2004, Leon Lewis used a cell phone which Williams had obtained for him. (Trial Transcript, June 10, 2005, 818-20). The phone number assigned to Lewis' phone was

269-325-3121.  (Tr. 822).

**Robert O'Brien**

As of October 30, 2004, O'Brien was employed as a detective with the Benton Township Police Department.  (Trial Transcript, June 10, 2005, 824).  Early that morning, O'Brien was assigned to assist in the investigation of the robbery and murder at the Napier Avenue Domino's Pizza location earlier that morning.  (Tr. 824).  O'Brien subsequently spoke with numerous individuals and obtained information beneficial to his investigation.  (Tr. 824-32).

**Johnny Bonds, Jr.**

At the time of Petitioner's trial, Bonds had been charged by state authorities with reckless driving, running a red light, and fleeing and eluding.  (Trial Transcript, June 10, 2005, 840-41).  Bonds had also been charged by the United States with drug distribution offenses.  (Tr. 841).  Bonds testified at Petitioner's trial pursuant to an agreement where by Bonds agreed to plead guilty to resisting and obstructing, in return for which the prosecutor would dismiss the other charges and recommend that Bonds be sentenced to time served.  (Tr. 841, 860-61).  The United States had not, however, promised Bonds anything in return for Bonds' testimony at Petitioner's trial.  (Tr. 841-42).

On the evening of October 29, 2004, Bonds was "partying and gambling" at a party on McGuigan Street.  (Trial Transcript, June 10, 2005, 842-43).  Petitioner arrived at the party at approximately 11:00 p.m.  (Tr. 844-45).  Petitioner had a cell phone and was wearing jeans and a gray hooded sweatshirt.  (Tr. 844-46).  Upon arriving at the party, Petitioner began shooting dice and gambling, without success.  (Tr. 844-45).  A short time later, Petitioner exited the party.  (Tr. 845).

Petitioner returned to the party approximately two hours later. (Tr. 846). Petitioner was wearing the same clothes, but no longer had a cell phone. (Tr. 846-47). When Petitioner returned to the party he had "close to a thousand bucks" which he used to resume gambling. (Tr. 847-48).

When Petitioner fled Benton Harbor, he traveled to South Bend where he stayed in a house owned by Candace McAlreth. (Tr. 849-50). Bonds and his cousin, Anthony Rimpson, used this location as a "safe house," a place where they could "hide out." (Tr. 849-50). When Bonds later learned that Petitioner was a suspect in the robbery and murder that occurred at the Napier Avenue Domino's Pizza on October 30, 2004, he instructed McAlreth to tell Petitioner to exit the safe house. (Tr. 851-52). When Bonds subsequently returned to the safe house, he learned that Petitioner had ignored his instructions. (Tr. 852). In response, Bonds and Rimpson beat Petitioner. (Tr. 852-54). Approximately one week later, Bonds and McAlreth spoke on the telephone with Petitioner who had by then escaped to Atlanta. (Tr. 855-57). During this conversation, Petitioner stated that he gave "the gun" to his cousin who disposed of it. (Tr. 858).

**James Willis**

As of October 29, 2004, Willis resided at 2265 Irving Drive in Benton Township. (Trial Transcript, June 10, 2005, 884). At approximately 11:30 p.m. that evening, Willis contacted the Napier Avenue Domino's Pizza and placed an order for several pizzas, some chicken wings, and soda. (Tr. 883-84). A "younger" black man, driving a "Domino's car," delivered Willis' order approximately one hour later. (Tr. 885).

**Carl DeLand**

Approximately one month before the start of trial, subpoenas were issued for sixty individuals. (Trial Transcript, June 10, 2005, 780-81). Fifty-five of these subpoenas were successfully served. (Tr. 781). One of the individuals on whom service was not successful was Charleccia Meridy. (Tr. 781-82). DeLand spoke with Charleccia Meridy's brother and mother in an attempt to locate her, but these efforts were unsuccessful. (Tr. 782-84). DeLand even sought the assistance of confidential informants to locate Meridy, again without success. (Tr. 784). DeLand and others continued, through the course of Petitioner's trial, to attempt to locate Meridy. (Tr. 784). The trial judge concluded that the prosecutor had exercised due diligence in attempting to locate Charleccia Meridy and effect service of a subpoena. (Tr. 796). Accordingly, the trial court later permitted Charleccia Meridy's testimony from Petitioner's preliminary examination to be read into the record. (Tr. 887-89).

**Charleccia Meridy**

Charleccia Meridy is Alvin Meridy's sister. (Trial Transcript, June 10, 2005, 891). In August 2004, without her brother's knowledge, Charleccia Meridy obtained a cell phone for Petitioner using her brother's cell phone account. (Tr. 890-94). The number assigned to the phone which Meridy procured for Petitioner was 269-876-8849. (Tr. 891-94). Petitioner agreed to pay his portion of Alvin Meridy's cell phone bill. (Tr. 894-95).

**Samrosette Yates**

At approximately 1:30 a.m. on October 30, 2004, Antwan Mims asked Yates to use

her phone to dial 876-8849. (Trial Transcript, June 14, 2005, 904-06). Yates agreed, but when she

dialed the number it was not answered by a person, but instead "a voice mail came on." (Tr. 906).

Yates indicated that she knew Leon Lewis, but did not know Petitioner. (Tr. 904-06). Moreover,

Yates had never observed Lewis and Petitioner together. (Tr. 906).


**Orational Leon Lewis**

Lewis testified at Petitioner's trial pursuant to a plea bargain. (Trial Transcript, June

14, 2005, 911-13). Specifically, Lewis agreed to plea guilty to aiding and abetting unarmed robbery[1]

and testify truthfully at Petitioner's trial. (Tr. 911-13). In return, the prosecutor agreed to dismiss

a related habitual offender charge and also recommend that Lewis be sentenced to serve no more

than one year in the county jail. (Tr. 911-13).

Lewis and Petitioner had known each other since 1997 and would associate from

"time to time." (Tr. 913). Lewis began working as a delivery driver for Domino's Pizza in July

2004. (Tr. 913-14). Lewis took this job to satisfy his child support obligations, but also earned

additional money, enough to care for his own needs, by "selling weed." (Tr. 945).

In mid-October 2004, Petitioner indicated to Lewis that he "needed some cash" and

began asking Lewis about the possibility of robbing the Domino's where Lewis worked. (Tr. 913-

16). Specifically, Petitioner began asking Lewis how much money was kept in the restaurant,

whether surveillance cameras were present, whether the doors into the restaurant were locked,

---

[1] Lewis was charged with aiding and abetting unarmed robbery in connection with the October 30, 2004,
robbery and murder at the Napier Avenue Domino's Pizza. (Tr. 995-96). Lewis was charged with aiding and abetting
unarmed robbery because the police "could not prove that Leon had any knowledge that [Petitioner] was in possession of
a handgun prior to the robbery." (Tr. 996).

whether Lewis knew the combination to the safe, and "when was a good time to go up in there." (Tr. 913-16). Lewis informed Petitioner that not much money was kept in the restaurant, surveillance cameras were present, the doors into the restaurant were "sometimes" locked, and that he did not know the combination to the safe. (Tr. 915). Lewis also informed Petitioner that he did not want to be present if Petitioner decided to commit robbery. (Tr. 916). A "couple of days" before October 29, 2004, Petitioner again questioned Lewis about the potential for robbing the Napier Avenue Domino's Pizza location. (Tr. 916). Lewis told Petitioner that "it ain't really worth it," but that if Petitioner was going to rob the restaurant he did not want to be present when it occurred. (Tr. 916).

On October 29, 2004, Lewis arrived at work at approximately 6:40 p.m. (Tr. 917). Darius Kyle and Isaac Washington were also working that evening. (Tr. 917-18). Sometime later that evening, Kyle gave Lewis a message to call Passion Wallace. (Tr. 918-19). Lewis dialed Wallace's phone number, but Nikki Childs answered the phone because Wallace was in the bathroom. (Tr. 919). While he was waiting to speak with Wallace, Lewis asked Childs to "call Pooh Bear on three-way." (Tr. 919). Childs complied with the request and Petitioner came on the line. (Tr. 919-20). When Lewis asked Petitioner, "what's up?," Petitioner responded, "you know what's up, you know what I'm talking about." (Tr. 920). Because of the possibility that Nikki could listen to their conversation, Lewis told Petitioner that he would call him back. (Tr. 920).

Later in the evening, Lewis had to deliver a pizza to a local Red Roof Inn. (Tr. 920). Lewis arrived at the Red Roof Inn at approximately 12:45 a.m. and immediately asked to use the "house phone" at the front desk. (Tr. 920-21, 923). The clerk acceded to this request and Lewis telephoned Petitioner. (Tr. 921-22). Lewis asked Petitioner, "why you trying to do this tonight. . .you know I ain't want to be at work when you did?" to which Petitioner responded that "he needed

some cash." (Tr. 922). Lewis told Petitioner, "if you going to do it, wait until I get off work." (Tr. 922). Lewis told Petitioner that he expected to be off work in approximately 15 minutes. (Tr. 922). Lewis then ended his conversation with Petitioner, completed his delivery, and returned to Domino's. (Tr. 923).

When Lewis arrived back at Domino's, Isaac Washington asked Lewis to make the last delivery of the night so that he could go home. (Tr. 923-24). Lewis agreed and soon thereafter departed to make a delivery to James Willis on Irving Drive. (Tr. 923-25, 930-31). Before making this delivery, however, Lewis stopped at a Sunoco station on Pipestone to use a payphone. (Tr. 925). Lewis called Petitioner's cell phone at approximately 1:05 a.m. and spoke with Petitioner. (Tr. 925-26). Lewis informed Petitioner that he "wasn't off work yet" and told him to "wait until I get off work." (Tr. 926). Petitioner responded by informing Lewis that he was already "in the Domino's parking lot by the back door." (Tr. 926). When Lewis again implored Petitioner to wait, Petitioner responded, "it's too late." (Tr. 926). Petitioner then hung up on Lewis. (Tr. 926-27). Lewis continued to Willis' residence to make his delivery, after which he returned to Domino's. (Tr. 927). Lewis returned to Domino's at approximately 1:30 a.m., by which time Petitioner had already robbed the restaurant and departed. (Tr. 927-28).

**Carl DeLand**

As of October 30, 2004, DeLand was employed as a Detective for the Benton Township Police Department. (Trial Transcript, June 14, 2005, 976-77). Early that morning, DeLand was dispatched to the Napier Avenue Domino's Pizza to investigate the robbery and homicide that occurred earlier that morning. (Tr. 977). Upon his arrival at this location, DeLand

assisted other officers process and investigate the crime scene. (Tr. 977-78). DeLand subsequently interviewed Leon Lewis and assisted other officers with the investigation. (Tr. 978-99).

As part of the investigation, DeLand interviewed Darius Kyle on November 14, 2004. (Tr. 1001-02). Kyle informed DeLand that "he heard that two people were involved in this robbery," Edward Porter (a.k.a. Poodie) and Leon Lewis. (Tr. 1002-03). Kyle told DeLand, however, that Edward Porter did not fit the description of the man that robbed the Domino's and murdered Isaac Washington, an assessment with which Detective DeLand agreed. (Tr. 1006). DeLand later checked records maintained by the Michigan Department of Corrections which indicated that Petitioner was five feet nine inches tall. (Trial Transcript, June 15, 2005, 1068).

**Geoffrey Flohr**

As of November 16, 2004, Flohr was employed as a Specialist Detective Sergeant with the Michigan State Police. (Trial Transcript, June 14, 2005, 1009). On this date, Flohr interviewed Darius Kyle. (Tr. 1009-10). During this interview, Kyle related a conversation that took place between himself, Leon Lewis, and another unidentified woman concerning a newspaper article about a robbery. (Tr. 1010). During this particular conversation Kyle "indicated that if he had done a robbery like that, one of the things that he would do was lay low after the robbery." (Tr. 1010-11). Kyle then stated to Flohr that "that's what Leon's doing now." (Tr. 1011). Kyle later stated that the robber's mask had come off "during the struggle." (Tr. 1011-12). Kyle stated that when this happened he saw the robber's face. (Tr. 1011-12). Kyle identified the robber as a man whose last name was Porter and whose street name was "Pooh." (Tr. 1012). However, when Flohr later asked Kyle if he had, in fact, observed the robber's face, Kyle responded, "no." (Tr. 1014-15).

**William Bradshaw**

In lieu of recalling Bradshaw to the witness stand, the parties stipulated that Bradshaw was "the first officer on the scene" and that if "questioned under oath. . .would testify that he was able to ask Isaac Washington at the scene for a description of the assailant and that Isaac Washington was able to tell him" that the assailant was "a black male, approximately five-five, wearing a white T-shirt and dark or black pants." (Tr. 1018-19).

**Calvin Hill**

Hill is Petitioner's cousin. (Trial Transcript, June 14, 2005, 1021-22). As of October 30, 2004, Hill resided on McGuigan Street. (Tr. 1022-23). Shortly after 12:00 a.m. that morning, Petitioner arrived at Hill's residence. (Tr. 1022-24). Petitioner was wearing a gray hooded sweatshirt and was carrying his cell phone. (Tr. 1024-26, 1034-36). Approximately 10-15 minutes later, Hill and Petitioner walked down the street to another residence on McGuigan to attend a house party. (Tr. 1022-26). When the pair arrived at the party, Hill stayed outside while Petitioner entered the residence. (Tr. 1026-27).

Hill remained outside with two other men. (Tr. 1026-28). Approximately 40 minutes later, Petitioner exited the residence and joined Hill and the other men. (Tr. 1028-29). Petitioner remained with this group for approximately 40 minutes, at which point Petitioner asked Hill if he could borrow some money "to get back in the dice game." (Tr. 1028-32). Hill agreed and gave Petitioner $100. (Tr. 1032). A short time later, Hill entered the residence and observed Petitioner playing dice. (Tr. 1032-33). Approximately 30 minutes later, Hill and Petitioner exited the residence at which point Hill walked home. (Tr. 1033).

At approximately 9:00 a.m. that morning, Petitioner phoned Hill. (Tr. 1033). Petitioner indicated that he had lost his cell phone and wondered if he had left it with Hill. (Tr. 1033-34). Hill indicated that he did not have Petitioner's cell phone, at which point Petitioner asked Hill to dial Petitioner's cell phone number in an attempt to locate his phone. (Tr. 1033-34). When Hill did so, his call either went straight to voice mail or produced a busy signal. (Tr. 1034).

Following the presentation of evidence, the jury found Petitioner guilty of first degree felony murder, armed robbery, possession of a firearm during the commission of a felony, and possession of a firearm by a felon. (Trial Transcript, June 15, 2005, 1186-87). Petitioner was sentenced to serve life in prison without the possibility of parole on the murder conviction and lesser prison sentences on the other convictions. (Sentencing Transcript, July 25, 2005, 19-20). Because Petitioner was on parole when he committed the offenses in question, he was also sentenced to first serve, on a consecutive basis, his earlier paroled sentence. (Tr. 20-21). Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I.  The trial court committed reversible error and denied defendant a fair trial by allowing two prosecution witnesses to testify after they were interviewed simultaneously by the prosecutor during a break in trial in direct violation of the sequestration order.

II.  The great weight of the evidence presented was insufficient to establish beyond a reasonable doubt that the defendant/appellant Gary Williams was guilty of the crimes charged.

III.  Defendant was denied a fair trial by the erroneous admission of testimony of flight and that he was apprehended out of state and extradited back to Michigan from Georgia.

IV.  Defendant's convictions must be set aside where his

attorney rendered constitutionally ineffective assistance and there is a reasonable probability that the outcome of the trial would have been different absent counsel's errors.

V.      Defendant was denied a fair trial by the repeated instances of prosecutorial misconduct during rebuttal argument.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Williams*, Case No. 265109, Opinion (Mich. Ct. App., Feb. 20. 2007). Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal, asserting the following issues:

I.      The trial court committed reversible error and denied defendant a fair trial by allowing two prosecution witnesses to testify after they were interviewed simultaneously by the prosecutor during a break in trial in direct violation of the sequestration order.

II.     The great weight of the evidence presented was insufficient to establish beyond a reasonable doubt that the defendant/appellant Gary Williams was guilty of the crimes charged.

III.    Defendant was denied a fair trial by the erroneous admission of testimony of flight and that he was apprehended out of state and extradited back to Michigan from Georgia.

IV.     Defendant's convictions must be set aside where his attorney rendered constitutionally ineffective assistance and there is a reasonable probability that the outcome of the trial would have been different absent counsel's errors.

V.      Defendant was denied a fair trial by the repeated instances of prosecutorial misconduct during rebuttal argument.

VI.     Newly discovered evidence establishes third party culpability and defendant's actual innocence of the

offense charged, and that a miscarriage of justice will result if relief is not granted in this case.

The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Williams*, Case No. 133545, Order (Mich., Oct. 24, 2007). Petitioner later moved in the trial court for relief from judgment, asserting the following issues:

I.    Whether the proofs at trial regarding malice were constitutionally insufficient so that the charges of felony murder and the included second degree murder charges should be dismissed because the essential element of malice was not proved beyond a reasonable doubt.

II.   Whether defendant was denied due process and a fair trial in violation of the 14th Amendment of the United States Constitution and the similar guarantees of the Michigan Constitution because the instructions to the jury were constitutionally defective.

III.  Whether defendant was denied his 6th Amendment right to counsel because of ineffective trial counsel.

IV.   Whether the defendant was denied a fair trial on his alibi defense.

V.    Whether the prosecutor was guilty of misconduct in his reply argument.

VI.   Whether this court should hold an evidentiary hearing on this newly discovered evidence and then order a new trial so that the jury can hear the testimony of Andrew Miller.

VII.  Whether, in addition to the individual constitutional errors discussed in this brief, the cumulative effect makes them even more significant.

VIII. Whether the unpreserved errors were plain errors.

IX.     Whether the errors caused a miscarriage of justice and can not be considered harmless.

X.      Whether the failure to raise issues on the direct appeal is excused by ineffective appellate counsel and/or should be waived by defendant's claim of actual innocence.

XI.     Whether the defendant has suffered actual prejudice as used in MCR 6.508(D)(3)(b).

XII.    Whether the court should schedule an evidentiary hearing.

The trial court denied Petitioner's motion. *People v. Williams*, Case No. 2004-406246-FC, Opinion (Berrien Cnty Trial Ct., June 17, 2009). Petitioner later moved for leave to appeal in the Michigan Court of Appeals, asserting the following issues:

I.      Whether the defendant was denied constitutional due process by the denial by the Michigan trial and appellate courts for an evidentiary hearing on his constitutional claim of ineffective trial counsel, ineffective appellate counsel, and on the newly discovered evidence presented by Michael Bedenfield.

II.     Whether the defendant's constitutional rights were violated by the withholding by the prosecution of the testimony of Michael Bedenfield contrary to *Brady v. Maryland*.

III.    Whether the proofs at trial regarding malice were constitutionally insufficient so that the charges of felony murder and the included second degree murder charges should be dismissed because the essential element of malice was not proved beyond a reasonable doubt.

IV.     Whether defendant was denied due process and a fair trial in violation of the 14th Amendment of the United States Constitution and the similar guarantees of the

Michigan Constitution because the instructions to the jury were constitutionally defective.

V.　　Whether defendant was denied his 6th Amendment right to counsel because of ineffective trial counsel.

VI.　　Whether the prosecutor was guilty of misconduct in his reply argument.

VII.　　Whether, in addition to the individual constitutional errors discussed in this brief, the cumulative effect makes them even more significant.

VIII.　　Whether the failure to raise issues on the direct appeal is excused by ineffective appellate counsel.

XI.　　Whether the defendant has suffered actual prejudice as used in MCR 6.508(D)(3)(b), whether there was a miscarriage of justice.

Petitioner's application for leave to appeal was denied "because defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Williams*, Case No. 295050, Order (Mich. Ct. App., Jan. 25, 2010). Petitioner later moved in the Michigan Supreme Court for leave to appeal this determination. It is not clear from the record what issues Petitioner presented in this particular appeal, but the Court has assumed that Petitioner asserted the same issues presented to the Michigan Court of Appeals. Petitioner's application for leave to appeal was denied on the ground that Petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Williams*, Case No. 140793, Order (Mich., Sept. 27, 2010). On October 12, 2010, Petitioner initiated the present action in which he asserts the following claims:

I.　　Whether the defendant was denied constitutional due process by the denial by the Michigan trial and appellate courts for an evidentiary hearing on his constitutional claim of ineffective trial counsel, ineffective appellate counsel, and on the newly

discovered evidence presented by Michael Bedenfield.

II.    Whether the defendant's constitutional rights were violated by the withholding by the prosecution of the testimony of Michael Bedenfield contrary to *Brady v. Maryland*.

III.    Whether the proofs at trial regarding malice were constitutionally insufficient so that the charges of felony murder and the included second degree murder charges should be dismissed because the essential element of malice was not proved beyond a reasonable doubt, and whether the proofs at trial were constitutionally insufficient to prove the identity of Petitioner as the robber beyond a reasonable doubt.

IV.    Whether defendant was denied due process and a fair trial in violation of the 14th Amendment of the United States Constitution and the similar guarantees of the Michigan Constitution because the instructions to the jury were constitutionally defective.

V.    Whether the trial court denied defendant a fair trial by allowing two prosecution witnesses to testify after they were interviewed simultaneously by the prosecutor during a break in direct violation of a sequestration order.

VI.    Whether defendant was denied a fair trial by the erroneous admission of testimony of flight and that he was apprehended out of state and extradited back to Michigan from Georgia.

VII.    Whether defendant was denied his 6th Amendment right to an attorney because of ineffective trial counsel.

VIII.    Whether petitioner was denied a fair trial because of repeated instances of prosecutor misconduct in his reply argument.

IX.     Whether, in addition to the individual constitutional errors discussed in this brief, the cumulative effect makes them even more significant to support the conclusion that petitioner had a fundamentally unfair trial.

X.      Whether the failure to raise issues on the direct appeal is excused by ineffective appellate counsel.

## STANDARD OF REVIEW

Williams' petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law

when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that

adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must

apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.        **Evidentiary Hearing  (Habeas Claim I)**

In conjunction with his initial appeal as of right in the Michigan Court of Appeals, Petitioner moved for a remand to the trial court for the purpose of conducting an evidentiary hearing on his claims of ineffective assistance[2] and newly discovered evidence. Petitioner's request was denied by the Michigan Court of Appeals for "failure to satisfy the requirements of [Michigan Court Rule] 7.211(C)(1)." *People v. Williams*, No. 265109, Order (Mich. Ct. App., Aug. 29, 2006). Petitioner unsuccessfully appealed this determination to the Michigan Supreme Court. *People v. Williams*, No. 132623, Order (Mich., Feb. 27, 2007).

Petitioner later moved in the trial court for relief from judgment, including a hearing

_____

[2] Hearings at which evidence is presented regarding claims of ineffective assistance of counsel are, in Michigan, referred to as *Ginther* hearings. *See People v. Ginther*, 390 Mich. 436 (1973).

at which to present evidence concerning his claims of ineffective assistance of counsel and newly discovered evidence. While the trial court did conduct an evidentiary hearing on Petitioner's claim of newly discovered evidence, the court denied Petitioner's request for a *Ginther* hearing citing Michigan Court Rule 6.508(D)(2) which provides that relief on grounds previously "decided against the defendant" cannot be granted unless the defendant "establishes that a retroactive change in the law has undermined the prior decision." Petitioner asserts that he is entitled to relief in the present matter because his requests for a *Ginther* hearing were denied and, moreover, because the trial court denied his request to conduct additional proceedings regarding newly discovered evidence from Michael Bedenfield.

1.    Newly Discovered Evidence

Following his conviction, Petitioner secured affidavits from Andrew Miller and Michael Bedenfield. (Dkt. #25). Andrew Miller asserted in his affidavit that he was guilty of the crimes for which Petitioner was convicted. Bedenfield asserted in his affidavit that he overheard Leon Lewis and Johnny Bonds, Jr. "making up and collaborating stories to place [Petitioner] at the scene" of the crime in question. Miller's affidavit was executed on March 7, 2007. Bedenfield's affidavit was executed on December 12, 2005.

The trial court conducted a hearing on Petitioner's motion for new trial based on newly discovered evidence on April 23, 2009. (Dkt. #20). At the outset of the hearing, Petitioner's counsel requested that the trial court "issue a writ for Michael Bedenfield" because he was "an important newly discovered witness" who "should be here." (Hearing Transcript, April 23, 2009, 14-15). The trial court, while not expressly ruling on counsel's request, nevertheless questioned

such, noting that Bedenfield did not appear to be a "newly discovered witness." (Tr. 15-16). As the trial court observed, Petitioner had, in his initial appeal as of right in the Michigan Court of Appeals, decided more than two years before, asserted that he was entitled to relief based on the contents of Bedenfield's affidavit. (Tr. 15-16).

The hearing continued with testimony being offered by Andrew Miller and Petitioner. Miller testified that he had, in fact, committed the crimes for which Petitioner was convicted. (Tr. 21-195). However, Miller later submitted an affidavit recanting this testimony. (Dkt. #30). Petitioner testified that he received Michael Bedenfield's affidavit on or about December 15, 2005. (Hearing Transcript, April 23, 2009, 196-201). Petitioner also testified that he was "completely innocent" of the crimes for which he had been convicted. (Tr. 202-49). The trial court denied Petitioner's motion for relief from judgment. *People v. Williams*, Case No. 2004-406246-FC, Opinion (Berrien Cnty Trial Ct., June 17, 2009). With respect to Michael Bedenfield, the trial court found that his affidavit did not constitute newly discovered evidence and, furthermore, even if it did constitute newly discovered evidence such was insufficient to merit a new trial.

Petitioner's claim that his right to due process was denied because the trial court denied his request for an evidentiary hearing at which to present evidence regarding Bedenfield's affidavit is without merit. First, the trial court *did* conduct an evidentiary hearing on Petitioner's motion for new trial based on newly discovered evidence. While Petitioner failed to present evidence from Bedenfield, Petitioner has failed to establish that this failure is attributable to anybody other than himself. As previously noted, Petitioner received Bedenfield's affidavit more than three years before the hearing in question and Petitioner has presented no evidence that he timely attempted to secure Bedenfield's attendance at the hearing or that any such efforts were impeded by

others. Simply stated, Petitioner was afforded the opportunity to present evidence regarding Bedenfield's affidavit, but through his own lack of diligence failed to avail himself of the opportunity.

Furthermore, Bedenfield does not assert that he possessed first hand evidence that calls into question Petitioner's convictions, but instead merely asserts facts that could be used to possibly impeach the testimony of Leon Lewis and Johnny Bonds, Jr. Lewis and Bonds both testified at trial and were subject to cross-examination concerning their credibility and other matters. In sum, because Petitioner cannot demonstrate that the trial court's action was "so egregious that it violated his right to a fundamentally fair trial," this claim is without merit. *Pudelski v. Wilson*, 576 F.3d 595, 611 (6th Cir. 2009).


2. *Ginther* Hearing

As previously noted, Petitioner's request for a *Ginther* hearing was denied by the Michigan Court of Appeals, the Michigan Supreme Court, and, ultimately, the trial court. Whether Petitioner was entitled to a *Ginther* hearing is a matter of state law. *See Ezell v. Cason*, 2007 WL 518853 at *7 (W.D. Mich., Feb. 14, 2007). Habeas relief is not available, however, based on alleged violations of state law. *See* 28 U.S.C. § 2254. Likewise, Petitioner's right to due process was not violated by the denial of his requests for a *Ginther* hearing because such did not deprive him of the ability or opportunity to assert his ineffective assistance of counsel claims in the state courts. *See Ezell*, 2007 WL 518853 at *8. Accordingly, this claim is rejected.

**II.**     ***Brady v. Maryland*** **(Habeas Claim II)**

Petitioner next asserts that the prosecution improperly failed to disclose Michael Bedenfield's testimony in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). This particular claim is without merit and, furthermore, is premised on significant mischaracterizations of the record by Petitioner.

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Wilson v. Mitchell*, 498 F.3d 491, 512 (6th Cir. 2007) (quoting *Brady*, 373 U.S. at 87). The material which must be disclosed under *Brady* "encompasses impeachment evidence as well as exculpatory evidence." *Wilson*, 498 F.3d at 512 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). To establish a *Brady* violation, Petitioner must establish: (1) the prosecution suppressed or withheld evidence, (2) such evidence was favorable to the defense, and (3) the suppressed evidence was material. *See Bushard v. Yukins*, 2004 WL 74659 at *1 (6th Cir., Jan. 7, 2004) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)).

The materiality requirement is not a sufficiency of the evidence test. *See In re McDonald*, 514 F.3d 539, 545-46 (6th Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995)). In other words, Petitioner is not required to demonstrate that consideration of the undisclosed evidence results in less than sufficient evidence to support his conviction. This is because "the possibility of an acquittal of a criminal charge does not imply an insufficient evidentiary basis to convict." *In re McDonald*, 2008 WL 89951 at *5 (quoting *Whitley*, 514 U.S. at 434-35). Also, the withheld evidence must be considered "collectively, not item by item." *Whitley*,

514 U.S. at 436-37. The materiality requirement is satisfied where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Whitley*, 514 U.S. at 435). In short, Petitioner must demonstrate a "reasonable probability of a different result." *Dretke*, 540 U.S. at 698 (quoting *Whitley*, 514 U.S. at 434).

In support of his claim for relief in this Court, Petitioner asserts that:

The affidavit from Michael Bedenfield was presented in the 6.500 [post-conviction] motion as part of Petitioner's newly discovered evidence claim. During the evidentiary hearing, at which the trial judge received evidence from Andrew Miller, the prosecutor claimed that the evidence from Michael Bedenfield was not newly discovered [and] that they (the prosecution) had known about it at the time of the trial.

(Dkt. #2 at 26 of 73).

While Petitioner presented Bedenfield's affidavit to the trial court during the evidentiary hearing, the assertion that "during the evidentiary hearing. . .the prosecutor claimed that the evidence from Michael Bedenfield was not newly discovered [and] that they (the prosecution) had known about it at the time of the trial" is simply not supported by the record. Rather, at the evidentiary hearing, the prosecutor merely argued that Bedenfield's affidavit was not newly discovered evidence because it had been known to Petitioner for more than three years and had been presented to the Michigan Court of Appeals on Petitioner's initial appeal as of right. (Hearing Transcript, April 23, 2009, 14-16). The Court finds nothing in the record indicating that the prosecutor ever stated (or even suggested) that the prosecution was aware of Bedenfield or the nature of his assertions at the time of Petitioner's trial. Petitioner has failed to cite to any portion of the record in support of this particular assertion.

Moreover, a review of Bedenfield's affidavit and Petitioner's testimony at the aforementioned evidentiary hearing reveals that it is unlikely that the prosecution had knowledge of such at the time of Petitioner's trial. Petitioner's trial began on June 7, 2005, and concluded on June 15, 2005. (Dkt. #11-16). Petitioner was sentenced on July 25, 2005. (Dkt. #18). At the aforementioned evidentiary hearing, Petitioner testified that he first met Bedenfield during his initial processing into the Michigan Department of Corrections following the imposition of his sentence. (Hearing Transcript, April 23, 2009, 197). According to Petitioner, Bedenfield approached him one day and stated, "man, I got some information that can help you on your case." (Tr. 198). Bedenfield "didn't give [the information] to [Petitioner] right then," however, but instead mailed Petitioner an affidavit "like five, six months" later. (Tr. 198-99). Petitioner testified that he received the affidavit on or about December 15, 2005. (Tr. 201).

In his affidavit, Bedenfield asserts that he first spoke with Leon Lewis in "early June 2005." (Dkt. #25). Bedenfield asserts that it was not until June 9, 2005, that Lewis and Johnny Bonds, Jr. allegedly discussed "making up and collaborating stories" to implicate Petitioner in the crime in question. Bedenfield further asserts that he subsequently "wrote to James A. Cherry, (Chief Prosecutor for Berrien County), and informed him of what Mr. Lewis and Mr. Bonds were doing, and I never received a response." Bedenfield fails to indicate in his affidavit the date on which he allegedly wrote to Cherry. *Id.* Petitioner likewise offers no evidence on the subject.

First, Petitioner's trial began two days *before* the alleged conversation Bedenfield describes in his affidavit even occurred. Furthermore, even if it is assumed that Bedenfield wrote to Cherry at his first opportunity, it is unlikely that Cherry would have received and been able to sufficiently investigate any such communication prior to the conclusion of Petitioner's trial. More

41

significantly, Petitioner has presented absolutely no evidence that the prosecution knew of Bedenfield or his alleged statements at the time of Petitioner's trial or, for that matter, at any time prior to Plaintiff's submission of Bedenfield's affidavit as part of his appeal as of right. Thus, Petitioner cannot establish that the prosecution suppressed or withheld the alleged evidence in question.

This claim was rejected by the Michigan courts. This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

## III.        Sufficiency of the Evidence  (Habeas Claim III)

Petitioner next argues that he is entitled to relief because insufficient evidence was presented to support his conviction for First Degree Felony Murder. Specifically, Petitioner alleges that "the proofs were insufficient to prove identity and malice beyond a reasonable doubt."

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its

judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

As of the date of Isaac Washington's murder, the elements of first degree felony murder were as follows: (1) the killing of a human being; (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result; (3) while committing, attempting to commit, or assisting in the commission of the felonies specifically enumerated in the felony-murder statute. *People v. Baugh*, 2004 WL 2412692 at *3 n.1 (Mich. Ct. App., Oct. 28, 2004). Armed robbery "is a well-established predicate felony under the felony-murder statute." *People v. Evans*, 2004 WL 1486058 at *4 (Mich. Ct. App., July 1, 2004).

The evidence presented at trial was more than sufficient to support Petitioner's conviction for First Degree Felony Murder. With respect to the identity of the man who committed the crimes in question, the evidence was quite substantial. The evidence established that Petitioner attended a party on the night in question wearing a gray hooded sweatshirt. Petitioner exited the party after losing money gambling. Shortly thereafter, a man wearing a gray hooded sweatshirt robbed the Napier Avenue Domino's Pizza. Petitioner later returned to the party with "a lot" of money and resumed gambling. Petitioner's cell phone was recovered from the crime scene. Furthermore, Petitioner phoned Leon Lewis immediately before committing the crime and stated that he was robbing the Domino's because "he needed some cash."

43

On the issue of malice, the evidence is equally compelling. Malice is defined as "the intent to kill, the intent to do great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v. Biggs*, 1999 WL 33437884 at *5 (Mich. Ct. App., Aug. 10, 1999). During the course of the robbery, Isaac Washington "rushed the robber" after which Washington and Petitioner struggled. Soon thereafter, Petitioner stated to Washington, "you done fucked up now," after which he shot Washington. This sequence of events, viewed in a light most favorable to the prosecution, is sufficient for a rational trier of fact to conclude that Petitioner intentionally fired his weapon with willful disregard that the natural tendency of such would be to cause death or great bodily harm.

This claim was rejected by the Michigan courts. This decision was neither contrary to, nor involve an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

IV.      **Jury Instructions  (Habeas Claim IV)**

Petitioner asserts that the instructions provided to the jury were deficient in several respects, each of which is discussed below.

Habeas relief is not appropriate merely because jury instructions "contain technical and unsubstantial errors." *Fears v. Bagley*, 462 Fed. Appx. 565, 578 (6th Cir., Feb. 16, 2012). Instead, relief is available only where "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991)). Furthermore:

It is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction. . .we inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. And we also bear in mind our previous admonition that we have defined the category of infractions that violate fundamental fairness very narrowly.

*Fears*, 462 Fed. Appx. at 578 (quoting *Estelle*, 502 U.S. at 72-73).

A.      Felony Murder Intent Instruction

Petitioner asserts several claims of error concerning the instruction concerning the intent necessary to convict him of felony murder. Petitioner asserts that the instructions regarding the felony murder charge were defective in that such "failed to inform the jury that the intent to commit an armed robbery with a gun is not, in itself, sufficient to show malice." Petitioner also argues that the instruction on the issue of intent was infirm because it failed to inform the jury "that intent can be inferred from all the facts [or] circumstances of the case but not from the intent to commit an armed robbery alone."[3]

With respect to the intent element of the felony murder charge, the trial judge instructed the jury that the prosecutor must prove beyond a reasonable doubt that:

the defendant had one of these three states of mind. He intended to kill or he intended to do great bodily harm to Isaac Washington or he knowingly created a high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions.

_____

[3]  Petitioner also asserts that the instruction regarding malice was inappropriate because "the prosecution conceded that the robber had no intent to kill." Petitioner has failed to cite to any portion of the record in support of this argument. Moreover, the Court discerns nothing in the record indicating that the prosecution made any such concession. While the focus of the prosecutor's closing argument regarding the element of intent may not have focused on an argument that Petitioner acted with the intent to kill, such hardly constitutes a concession that Petitioner "had no intent to kill." Accordingly, this argument is rejected.

(Trial Transcript, June 15, 2005, 1172).

Prior to 1980, it was permissible under Michigan law to find the requisite malice to convict a defendant of felony murder based solely on a finding that the defendant intended to commit the underlying felony during which the death in question occurred. *See People v. Dumas*, 563 N.W.2d 31, 34 (Mich. 1997). Following the decision of the Michigan Supreme Court in *People v. Aaron*, 299 N.W.2d 304 (Mich. 1980), however, to establish malice in the felony murder context, the prosecution was required to "prove one of the three intents that define malice in every murder case." *Dumas*, 563 N.W.2d at 34 (citing *Aaron*, 299 N.W.2d at 304). The three intents in question are: (1) the intent to kill; (2) the intent to do great bodily harm; or (3) a wanton and willful disregard of the likelihood that the natural tendency of the defendant's act is to cause death or great bodily harm. *Dumas*, 563 N.W.2d at 34 (citing *Aaron*, 299 N.W.2d at 304).

While the *Aaron* decision foreclosed finding malice in a felony murder context "from the intent to commit the underlying felony alone," the Michigan Supreme Court made clear that "the jury may infer a malicious intent from the facts and circumstances of the underlying felony." *Dumas*, 563 N.W.2d at 34 (citing *Aaron*, 299 N.W.2d at 304). Specifically, the *Aaron* court observed that:

> The facts and circumstances involved in the perpetration of a felony may evidence an intent to kill, an intent to cause great bodily harm, or a wanton and willful disregard of the likelihood that the natural tendency of defendant's behavior is to cause death or great bodily harm; however, the conclusion must be left to the jury to infer from all the evidence.

*Dumas*, 563 N.W.2d at 34 (citing *Aaron*, 299 N.W.2d at 304).

The *Dumas* court emphasized, however, that while the jury may make such an inference, the trial court is not required to provide an instruction regarding such. *Dumas*, 563

N.W.2d at 39. Instead, it is sufficient if the jury is simply instructed as to the aforementioned definition of malice. *Id.* ("[w]e, of course, would leave to the trial court's discretion to determine whether there is a need for additional instructions on the question of malice beyond the definition of malice supplied in *Aaron*"). As the court further cautioned, if the trial court "decides to give an instruction that the jury may infer malice from the commission of an underlying crime, it should further explain at the same time that the jury may only infer this malice if the facts and circumstances of the intent to commit the underlying crime warrant the inference." *Dumas*, 563 N.W.2d at 39.

Thus, the Court does not read *Dumas* or *Aaron* as *requiring* an instruction that intent can (or must) be inferred from all the facts and circumstances, as Petitioner asserts. Instead, the Court interprets this authority as standing for the proposition that a jury instruction concerning malice is sufficient if it goes no further than providing the malice definition articulated by the *Aaron* court, but that if the trial court wishes to further instruct the jury that it may infer malice from the commission of the underlying crime, such must also be accompanied by an instruction that such an inference is permissible only if all the facts and circumstances warrant such. This interpretation is consistent with the concern expressed by the *Aaron* court (and subsequent courts) that in the context of felony murder that a jury not find intent to commit the murder based solely on the fact that the defendant intended to commit the underlying felony.

The trial court's instruction on malice comported with this authority. The jury was instructed that to establish malice the prosecutor had to prove beyond a reasonable doubt that Petitioner acted with one of the three aforementioned states of intent. The jury was not instructed that malice could be inferred from the fact that Petitioner committed an armed robbery. In sum, as the trial court concluded, the instruction regarding malice was completely consistent with controlling

authority from the Michigan Supreme Court.

### B.    Accident Instruction

In his closing argument, Petitioner advanced two defenses: (1) an alibi establishing that he could not have committed the crimes in question, and, in the alternative, (2) that the killing of Isaac Washington was an accident (i.e., he did not intend to shoot or kill him).  (Trial Transcript, June 15, 2005, 1109-11).  Accordingly, the trial court instructed the jury on both defenses.  (Tr. 1175, 1177).  Petitioner nevertheless asserts that the decision to instruct the jury on the issue of accident  deprived him of the right to a fair trial.

Specifically, Petitioner asserts that he is entitled to relief because the trial court's instruction on accident improperly preceded the instruction on alibi and "told the jury that Defendant admits that he was the robber."  Petitioner further asserts that the trial court's alibi instruction was not presented as a defense to the crimes in question, but simply as an item on which the jury heard evidence.  Petitioner argues that "because of the order and wording [of the alibi instruction], no jury would consider alibi."

With respect to the defense of accident, the trial court properly instructed the jury that "[i]f the defendant did not mean to pull the trigger, then he's not guilty of murder."  (Tr. 1175).  As for Petitioner's claim that the accident instruction "told the jury that Defendant admits that he was the robber," the Court is not persuaded.  The comment to which Petitioner objects is the trial court's statement to the jury that "the defendant says Isaac Washington died because the gun went off accidentally during his struggle with Isaac Washington."  (Tr. 1175).  While this instruction could perhaps have been worded a bit more precisely, the Court does not interpret the trial court's

instruction as telling the jury that Defendant was the robber. Moreover, it must be remembered that the instruction on accident has no relevance unless the jury concludes that Defendant was, in fact, the person who robbed the Domino's Pizza on the night in question.

Petitioner's argument about the wording and timing of the alibi instruction is similarly unpersuasive. The trial court's alibi instruction was as follows:

> You have heard evidence that the defendant could not have committed the alleged crime because he was somewhere else when the crime was committed. The prosecutor must prove beyond a reasonable doubt that the defendant was actually there when the crime was committed.

> The defendant does not have to prove he was somewhere else. If, after carefully considering all the evidence, you have a reasonable doubt about whether the defendant was actually present when the alleged crime was committed, you must find him not guilty.

(Tr. 1177).

Petitioner's assertion that this instruction was not presented as a defense is unpersuasive. While the challenged instruction may not have included the word "defense," the content of the instruction clearly presented Petitioner's alibi claim as a defense to the crimes in question. Likewise, the Court is unpersuaded by Petitioner's argument that he is entitled to relief because the alibi instruction was presented after the instruction on accident. The Court discerns nothing in the wording or order of the two instructions at issue that diminished either defense or prejudiced Petitioner.


C.      Involuntary Manslaughter Instruction

Petitioner alleges that the instruction regarding involuntary manslaughter "was

completely erroneous and failed to instruct the jury on the proper elements of involuntary manslaughter as applicable to the facts of this case."  With respect to the issue of involuntary manslaughter, the jury was instructed, immediately following the instructions on first and second degree murder, as follows:

> You must also consider - you may also consider the lesser charge of involuntary manslaughter.  To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt.

> First, that the defendant caused the death of Isaac Washington.  That is, that Isaac Washington died as a result of a gunshot wound.  Second, in doing the act that caused Isaac Washington's death, the defendant acted in a grossly negligent manner.

(Tr. 1175).

Petitioner asserts two distinct errors with this particular instruction.  First, Petitioner asserts that because "this was not a gross negligence case," a different involuntary manslaughter instruction should have been given.  Specifically, Petitioner asserts that the jury should have been instructed that "if [they] do[] not find the required intent [to support a murder conviction] they may consider the lesser offense of involuntary manslaughter."  Petitioner asserts that the trial court's error in this regard was compounded by its failure to also instruct the jury on the definition of gross negligence.

Manslaughter is a lesser included offense of murder.  *People v. Holtschlag*, 684 N.W.2d 730, 742 n.13 (Mich. 2004).  Accordingly, "when a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence." *People v. Mendoza*, 664 N.W.2d 685, 693 (Mich. Ct. App. 2003).  As of October 30, 2004, there existed in Michigan three distinct "types" of involuntary manslaughter: the

unintentional killing of another, without malice, (1) during the commission of an unlawful act not naturally tending to cause great bodily harm; (2) during the commission of some lawful act, negligently performed; or (3) in the negligent omission to perform a legal duty. *Holtschlag*, 684 N.W.2d at 739. The first of these types is referred to as "unlawful-act" involuntary manslaughter whereas the latter two types are referred to "lawful-act" involuntary manslaughter. *Id.* at 739-40.

It is well established that "the sole element distinguishing manslaughter and murder is malice and that involuntary manslaughter is a catch-all concept including all manslaughter not characterized as voluntary." *Holtschlag*, 684 N.W.2d at 742 (internal citation omitted). With respect to the different types of involuntary manslaughter, there exists an important distinction concerning the requisite mens rea that must be established. To convict of "lawful-act" involuntary manslaughter, it must be proven that "the defendant acted with a mens rea of culpable negligence," whereas a conviction for "unlawful-act" involuntary manslaughter "does not require that the defendant acted with a specific mens-rea - all that is required is that the defendant committed the unlawful act." *Id.* at 740. Thus, "if the defendant committed an *unlawful* act that resulted in death, it is sufficient to allege the commission of the unlawful act and the resulting death." *Holtschlag*, 684 N.W.2d at 739-40 (emphasis in original).

A reasonable juror could have concluded that Petitioner did not *intentionally* kill Isaac Washington, therefore, instructing the jury on involuntary manslaughter was appropriate. While Petitioner appears to be correct that "this was not a gross negligence case," the requirement in the challenged instruction that the jury find that Petitioner acted with gross negligence, while in error, inured to Petitioner's benefit. As noted above, with respect to involuntary manslaughter the prosecution has to prove the requisite level of intent (i.e., culpable negligence) only in circumstances

of "lawful-act" involuntary manslaughter. Because Petitioner's actions on the night in question were not lawful he could only have been convicted of "unlawful-act" involuntary manslaughter regarding which no intent or mens rea need be proven. Thus, the inclusion of the gross negligence instruction required the prosecution to establish an additional element (culpable negligence by Petitioner) that it should not have had to establish to secure a conviction for involuntary manslaughter.

While the challenged instruction could have more clearly stated that involuntary manslaughter applied if the jury determined that Petitioner did not act with the requisite malice to support a murder conviction, subsequent instructions greatly clarified matters in this respect. (Trial Transcript, June 15, 2005, 1178-79). Specifically, shortly after giving the challenged instruction, the trial judge reiterated to the jury that it was to first consider the charge of first degree murder and that if it found Petitioner guilty of this crime it need not consider the offenses of second degree murder or involuntary manslaughter. (Tr. 1178-79). The jury was further instructed that if it did not find Petitioner guilty of first degree murder it should then consider whether Petitioner was guilty of second degree murder and, if it did not find Petitioner guilty of second degree murder, consider whether Petitioner was guilty of involuntary manslaughter. (Tr. 1178-79).

Furthermore, any error in this respect was necessarily harmless. As the trial court observed, "the jury found [Petitioner] guilty of first degree felony murder, which required the jury to find, beyond a reasonable doubt, that [Petitioner] acted with malice." *People v. Williams*, Case No. 2004-406246-FC, Opinion at 25 (Berrien Cnty Trial Ct., June 17, 2009). As the trial court further concluded, because the jury found Petitioner guilty of first degree murder "even if there was some slight error in the involuntary manslaughter instruction, [Petitioner] cannot show that there is a reasonable probability that the result of the proceedings would have been different had the

instruction been worded differently." *Id.*

Petitioner's challenge to these various jury instructions was rejected by the Michigan courts. This decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

**V.          Evidentiary Claims  (Habeas Claims V and VI)**

Petitioner asserts two separate arguments that his right to a fair trial was violated by the introduction of improper evidence. First, Petitioner asserts that two witnesses were improperly permitted to testify after being simultaneously interviewed by the prosecutor. Petitioner next asserts that testimony regarding his flight to Georgia and subsequent extradition to Michigan was improperly admitted.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction

violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted). Whether the admission of evidence constitutes a denial of fundamental fairness "turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Ege v. Yukins*, 485 F.3d 364, 375 (6th. Cir. 2007).

The Sixth Circuit has found that the improper introduction of evidence violated a criminal defendant's right to a fair trial where the challenged evidence was the only direct evidence linking the defendant to the crime. *See Ege*, 485 F.3d at 374-78. However, where there exists sufficient other evidence of guilt and the challenged evidence is only "peripheral to the case against" the defendant, the admission of the challenged evidence does not violate due process. *Collier v. Lafler*, 2011 WL 1211465 at *3 (6th Cir., Mar. 30, 2011).

A.    Sequestration Issue

DaJuan Rimpson and Jameel McGee, both of whom testified at Petitioner's trial, are brothers. (Trial Transcript, June 10, 2005, 750-51). McGee testified on the third day of trial and Rimpson testified on the morning of the fourth day of trial. During cross-examination, the following

exchange occurred between Rimpson and Petitioner's counsel:

Counsel:        Have you and your brother ever - excuse me.  Have you and your brother at any time ever talked about what happened at that gambling party with Gary Williams?

Rimpson:        I talked to him about it.

Counsel:        Together?

Rimpson:        Yes.  Me, him and him.

Counsel:        When you talked to [the prosecutor] -

Rimpson:        Yeah.

Counsel:        - and you discussed your testimony, you and your brother were together?

Rimpson:        That's the only time

Counsel:        How long did you talk to [the prosecutor] with both you and your brother together?

Rimpson:        About five minutes.

Counsel:        And when was that?

Rimpson:        Yesterday.

Counsel:        Where was that discussion?

Rimpson:        Where was it?

Counsel:        Yes.

Rimpson:        In a room back there somewhere.

Counsel:        A room back here on this floor somewhere?

Rimpson:        Yeah.

Counsel:        And he asked both you and your brother questions?

Rimpson:        He asked him first, then he got to me.

Counsel:        And you were both present during that - during the entire conversation?

Rimpson:        Yes.

Counsel:        And that conversation concerned your testimony in court?

Rimpson:        Not really.  It was - he was -

Counsel:        What was the conversation about?

Rimpson:        He was asking him questions, I was -

Counsel:        About?

Rimpson:        - (inaudible) -

Counsel:        About that gambling party, right?

Rimpson:        Yeah.

Counsel:        And your brother was answering those questions, correct?

Rimpson:        Not really.  Just saying, yes, no, yes, no.

Counsel:        And did he ask you questions?

Rimpson:        Yes.

Counsel:        And did you answer him, yes, no?

Rimpson:        Yes.

(Tr. 770-72).

Following this testimony, Petitioner moved for a mistrial.  (Tr. 776).  Petitioner asserted that a mistrial was appropriate because Rimpson and McGee had testified in violation of the trial court's sequestration order.  (Tr. 776).  The trial court denied Petitioner's motion. (Tr. 777-

79).  Specifically, the court observed that while the better practice may have been for the prosecutor to speak with Rimpson and McGee separately, "the witnesses are not sequestered from counsel, they're allowed to talk to counsel representative - a direct representative of counsel." (Tr. 778).  The court further observed that during the encounter in question Rimpson and McGee "were not talking to each other," but were instead simply speaking with the prosecutor.  (Tr. 778).

At the outset of Petitioner's trial, the trial court "order[ed] that the witnesses in this matter be sequestered." (Trial Transcript, June 7, 2005, 4).  The trial court explained that this meant that "witnesses who may be called to testify. . .are not allowed in the courtroom while the trial is proceeding except for the time period when they themselves will be testifying." (Tr. 4).  The court further explained that witnesses were "not allowed to discuss their testimony with anyone or with - anything that has gone on inside of the courtroom with anyone when they were not here in the courtroom with the exception, of course, with the two attorneys when they speak with them about the case." (Tr. 4).

As the trial court observed, there is no evidence that the sequestration order was violated.  Specifically, there is no evidence that Rimpson and McGee discussed their intended testimony with each other or otherwise acted in a manner prejudicial to Petitioner's right to a fair trial.  Petitioner cross-examined Rimpson on the subject, and could have recalled McGee for similar cross-examination, which constitutes a sufficient remedy to inadvertent violations of a sequestration order.  *See Lewis v. Bell*, 2006 WL 4557166 at *26-27 (E.D. Mich., Aug. 31, 2006).  Furthermore, sequestration is not a constitutional requirement.  *See, e.g., Middleton v. Birkett*, 2008 WL 4981073 at *26 (E.D. Mich., Nov. 21, 2008); *Savoy v. Cain*, 2007 WL 4812290 at *9 (W.D. La., Oct. 9, 2007).  Petitioner has identified no authority that the conduct in question violates the Constitution.

Finally, Petitioner has failed to demonstrate how this circumstance prejudiced his ability to defend himself or violated his right to a fair trial.

This claim was rejected by the Michigan courts. This decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue on which habeas relief may be granted.

### B.    Evidence of Flight

As discussed above, evidence was presented at trial that immediately following Isaac Washington's murder, Petitioner fled the state of Michigan, was eventually captured in the state of Georgia, and was later extradited to Michigan to stand trial. Petitioner asserts that introduction of this evidence deprived him of the right to a fair trial.

As the Sixth Circuit has recognized, where "evidence of flight has genuine probative value" such is "generally admissible" and "juries are given the power to determine how much weight should be given to such evidence." *United States v. Dillon*, 870 F.2d 1125, 1126 (6th Cir. 1989); *see also*, *Burgess v. Bergh*, 2011 WL 2413660 at *9 (E.D. Mich., June 10, 2011) (same). While the trial judge informed the jury that it could consider whether evidence of Petitioner's flight reflected a guilty state of mind, the judge also clearly instructed the jury that "a person may run or hide for innocent reasons" and "this evidence does not prove guilt." (Trial Transcript, June 15, 2005, 1165). This instruction is "constitutionally sound," as it "clearly communicates that the jury 'may' consider unexplained flight in determining guilt or innocence but is not required to do so." *Drake v. Superintendent, Trumbull Correctional Institution*, 1997 WL 14422 at *7 (6th Cir., Jan. 14, 1997).

In sum, admission of this evidence was not improper and the judge's instruction to the jury properly limited the extent to which such evidence could be used.

This claim was rejected by the Michigan courts. This decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Thus, this claim raises no issue on which habeas relief may be granted.

**VI.          Prosecutorial Misconduct  (Habeas Claim VIII)**

Petitioner next asserts that the prosecutor engaged in "misconduct" during closing argument, thereby violating his right to a fair trial. The comments in question are as follows:

> I'm going to give you a little inside view of the dark recesses of my mind as I was watching Mr. Sammis' closing argument because it reminded me of something. Trial attorneys are really frustrated actors. A little known fact about Mr. Sammis is he - he a very good Twin City Players character actor. But when I was watching him in that opening, when all of a sudden now he's giving you a second defense theory in this case, not just alibi, but accident, it reminded me of when I was a law school student. I was very fortunate to represent my law school at a moot court competition in New York City. And the professor, who was our adjunct assisting professor, was very kind on us poor struggling law students. He actually bought us tickets to go see a play on Broadway. It was my first. It was great. It was a play called - it was actually a musical, the Best Little Whorehouse in Texas. If you saw the movie, Dolly Parton and Burt Reynolds made a version of it.
>
> But as I was watching Mr. Sammis it occurred to me that he was just like one of the characters. There's a double talking politician in that particular show, deals with a whorehouse called the Chicken Ranch in Texas. And in one side of that politician's mouth, when the reverends and the public spotlight gets on the fact there's a whorehouse in Texas, he's saying, oh, there's a whorehouse in Texas, oh my golly, save our soul, he says on one side of his mouth. And

then on the other one he's saying, but wait a minute. now, as he had been a frequent visitor in the past, let's not get carried away and kill all the fun, boys will be boys. And then he breaks into a song called the Sidestep. I can remember it, just as Mr. Sammis was talking, him dancing on that stage, ooh, I like to dance a little sidestep, cut a little swathe and lead the people on.

Mr. Sammis, throughout his close - or his opening statement and this entire case has said the evidence is going to show my client was not there. Calvin Hill testified he didn't leave that party. I have an alibi defense. And now in his closing what is he doing? It's a mistake. Ladies and gentlemen, he wasn't there because Calvin Hill says he wasn't. But ladies and gent, if you don't believe that, I got another one. It's a mistake. It's simply an accident. As you're going to tell, that line, it's an accident, simply an accident is from another favorite musical of mine, The Phantom of the Opera. In the Phantom of the Opera, there's a scene - I hope you saw it, it's a great show - where the Phantom is up in the rafters above the stage during a performance at the opera house. And in a fight with kind of a nasty guy who works as part of the crew in the back, he gets into a fight with him. And the Phantom loops a noose around his neck and throws him off the rafters and right in the middle of the performance he's hanging there hanging. The guy dies.

And the owner of the opera house, in order to calm the audience, says it was an accident, simply an accident. Much like Mr. Sammis is now telling you. Well, look at the evidence, this fight, this struggle over the gun where Isaac Washington was shot. If you don't believe my defense alibi witness that his client never lost, well, okay, if he was there in the struggle, it was an accident.

It wasn't anymore of an accident when the Phantom looped that noose around his throat and pushed him off the rafters and hung him than it was when the defendant, when Isaac got up off that floor and struggled with the robber, shot him. That's not an accident. It's not, as the instruction you're going to be given, even of a lesser offense of second degree murder, but now involuntary manslaughter, that Isaac died because the defendant acted in a grossly negligent manner in shooting Isaac during that struggle. Phooey. That's hooey. This was no accident.

(Trial Transcript, June 15, 2005, 1147-49).

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219). Thus, even if the challenged comments were improper, habeas relief is available only where the comments were "so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two part analysis. The Court must first determine whether "the prosecutor's conduct and remarks were improper." *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007). If such is the case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal." *Id.* at 759. When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the comments were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial. *Id.*

It is appropriate for a prosecutor to "highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Bates v. Bell*, 402 F.3d

635, 646 (6th Cir. 2005). Likewise, the prosecutor is permitted to "point out the lack of evidence supporting [the defendant's] theories" of the case. *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005). Nevertheless, a prosecutor may not "make unfounded and inflammatory attacks on the opposing advocate," *United States v. Young*, 470 U.S. 1, 9 (1985), or "argue that counsel is attempting to mislead the jury." *West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008).

Most of the challenged commentary, while perhaps unconventional and ill-considered, was not inappropriate. The prosecutor was primarily responding to Petitioner's competing (and arguably contradictory) defenses of alibi and accident. Nevertheless, the prosecutor's statement that defense counsel "like[d] to dance a little sidestep, cut a little swathe and lead the people on," constitutes an inappropriate argument that defense counsel was attempting to mislead the jury. However, while this particular comment was inappropriate, such did not deprive Petitioner of a fundamentally fair trial. It is unlikely that the comment in question prejudiced Petitioner or mislead the jury. While the objectionable comment does not appear to have been made accidentally, such was, in the context of a lengthy trial with numerous witnesses, quite isolated. Finally, the evidence against Petitioner was quite substantial.

This claim was rejected by the Michigan courts. This decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Thus, this claim raises no issue on which habeas relief may be granted.

VI.     **Ineffective Assistance of Counsel  (Habeas Claims VII and X)**

Petitioner asserts numerous claims that his right to the effective assistance of both

trial and appellate counsel was denied. Specifically, Petitioner alleges his trial counsel rendered deficient performance in the following ways: (1) failed to investigate an alibi defense; (2) failed to timely file a notice of alibi; (3) questioned only one witness to support Petitioner's alibi defense; (4) conceded in his opening statement that the evidence established that a robbery and murder occurred on the night in question; (5) requested that the jury be instructed on the defense of accident; and (6) failed to move for a directed verdict. Petitioner argues that his appellate counsel rendered deficient performance in the following ways: (1) failed to move for a new trial; (2) failed to move in the trial court for a *Ginther* hearing; (3) failed to assert on Petitioner's appeal the various errors made by trial counsel.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom. *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411 (2009)). To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689). Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 131 S.Ct. at 740. Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Id.* (citations omitted). As the Supreme Court recently concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal citations omitted).

### A.     Trial Counsel - Alibi Issue

Petitioner asserts that his trial attorney failed to investigate his alibi defense, failed to timely file a notice of alibi, and questioned only one witness at trial to support his alibi defense.

First, Petitioner's claim that his attorney failed to timely file a notice of alibi is rejected. Petitioner has identified no evidence or item in the record to support this assertion. Moreover, a review of the record directly counters Petitioner's assertion. Petitioner asserted in his opening statement that his primary defense was that he had an alibi. At trial, Petitioner presented evidence from Calvin Hill in support of his alibi defense. Furthermore, Petitioner argued in closing that he was entitled to acquittal on the basis of his alibi and the jury was instructed concerning Plaintiff's alibi defense. In short, there is no evidence to support this particular claim. Accordingly, because Petitioner cannot demonstrate that counsel rendered deficient performance in this respect, this particular claim is without merit and cannot form the basis of habeas relief.

As for Petitioner's argument that counsel ineffectively pursued his alibi defense, the result is the same. In his pleadings submitted in this Court, Petitioner has failed to adequately develop this claim. Specifically, while asserting that counsel failed to sufficiently investigate his alibi defense, Petitioner has failed to identify in his pleadings in this Court any evidence in support of his position or articulate how any such evidence advances his position. Judging from Petitioner's previous state court pleadings, however, it appears that Petitioner's argument is premised on the affidavits executed by four individuals and the belief that had these individuals been questioned at trial the outcome of his trial would have been different. A review of these affidavits, however, reveals that such fail to advance Petitioner's position. (Dkt. #23).

Andrew Miller asserted in his affidavit that he and Petitioner were both present at Jameel McGee's residence on the night of October 29, 2004. Miller further asserted, however, that Petitioner could not have committed the crimes in question because he (Miller) robbed the Domino's Pizza in question and shot Isaac Washington. As previously discussed, however, Miller later

admitted that the assertions in his affidavit were false. Moreover, Miller does not assert that he ever spoke with Petitioner's counsel or that Petitioner or his counsel had any reason to believe that Miller possessed any information or evidence relevant in this matter at the time of Petitioner's trial.

Shontia Williams asserted in her affidavit that she arrived at McGee's residence on the night in question at approximately 12:30 a.m. and spoke with Petitioner upon her arrival. Williams asserted that she remained at the party for a brief period and then departed to go to a bar. Williams further asserted that she spoke with Petitioner's counsel and explained what she "seen and knew" about the matter. Petitioner's counsel informed Williams that he would contact her if her assistance was needed.

Jeremy Burrell asserted in his affidavit that he and Petitioner were both present at McGee's residence on the night in question. With respect to what occurred while Burrell was at this party, Burrell's affidavit is very poorly written and it is unclear precisely what Burrell is asserting. Nevertheless, the Court will assume that Burrell has asserted that Petitioner was at the party at the time the crimes in question occurred. Burrell further asserts, however, that while he was subpoenaed to testify at Petitioner's trial, he disregarded the subpoena because there existed "a warrant for [his] arrest at the time of [Petitioner's] trial."

Edward Porter asserted in his affidavit that on the night in question he arrived at McGee's residence at approximately 12:45-1:00 a.m. When he arrived, Porter saw Petitioner standing outside. At approximately 2:00 a.m., Porter saw Petitioner "playing dice." Porter asserts that he spoke with Petitioner's lawyer about this matter and was later subpoenaed to testify at Petitioner's trial. Porter asserts that he appeared at Petitioner's trial, but was never called to testify.

As previously noted, there exists a "strong presumption" that counsel's representation

was not deficient and the burden rests with Petitioner to establish that counsel "made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Petitioner has not even attempted to argue how these various affidavits satisfy this standard. Petitioner has presented no evidence that he or his attorney had any reason to believe, at the time of trial or prior thereto, that Miller possessed any information or evidence relevant in this matter. Thus, Petitioner cannot establish that counsel was deficient for failing to investigate, speak with, or question at trial Andrew Miller. Furthermore, it cannot constitute deficient performance for an attorney to fail to question at trial an admitted liar such as Miller.

Shontia Williams acknowledges that Petitioner's counsel spoke with her about this matter and was aware of the nature of the testimony she would offer at trial. Petitioner, however, offers no evidence to rebut the presumption that counsel's decision not to question Williams at trial was anything other than a legitimate strategic decision. Given that Williams' assertions do not necessarily rule out that Petitioner committed the crimes in question, Petitioner cannot overcome this presumption.

As for Jeremy Burrell, the evidence reveals that counsel did subpoena Burrell to testify at trial, but that Burrell decided not to appear because he feared being arrested. Such hardly constitutes deficient performance by Petitioner's counsel. Finally, with respect to Edward Porter, the fact that counsel subpoenaed Porter to appear at trial demonstrates that counsel investigated Petitioner's alibi defense. While counsel apparently decided not to question Porter at trial, Petitioner offers no evidence to rebut the presumption that counsel's decision was anything other than a legitimate strategic decision. Again, given that Porter's assertions do not necessarily rule out that Petitioner committed the crimes in question, Petitioner cannot overcome this presumption.

In sum, Petitioner cannot establish that counsel's performance with respect to the investigation and presentation of his alibi defense was constitutionally deficient. Furthermore, even if Petitioner could make such a showing, relief would be foreclosed because the evidence on which Petitioner's claim rests does not establish that Petitioner suffered any prejudice as a result of counsel's actions. Simply stated, the assertions contained in the four aforementioned affidavits are woefully inadequate to establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

B.      Trial Counsel - Opening Statement

In his opening statement, Petitioner's counsel stated the following:

> As [the prosecutor] has alluded, this case is one of identity. We don't contest the fact that a murder and a robbery took place at the Domino's on the very early morning hours of October 30th. We do contest that Gary Williams was the person that committed that - those offenses.

(Trial Transcript, June 7, 2005, 206).

Petitioner argues that his attorney's concession that "a murder and a robbery took place" constituted ineffective assistance. While not clearly articulated, it appears that Petitioner faults his attorney not for conceding that a robbery occurred and that during such Isaac Washington was killed. Instead, it appears that Petitioner faults his attorney for using the word "murder" when making this concession. Petitioner appears to assert that by using this particular word, his attorney was conceding that whoever killed Isaac Washington acted with the requisite intent to be found guilty of murder and not a lesser charge such as manslaughter or acquitted on the basis of an accident.

68

While it would perhaps have been more appropriate for counsel to have referred to Isaac Washington's death as a killing rather than a murder, reviewing counsel's comment in context reveals that Petitioner is not entitled to relief. The statement in question occurred during Petitioner's opening statement, long before the jury was instructed and began their deliberations. Jurors are presumed to follow their instructions and there is no evidence that the jury in Petitioner's case failed to understand or follow their instructions concerning the distinction between first degree murder, second degree murder, manslaughter, and accident. In his closing argument, counsel did not refer to the killing of Isaac Washington as "murder," but instead specifically argued that the killing of Isaac Washington did not constitute murder. (Trial Transcript, June 15, 2005, 1109-10). In sum, Petitioner cannot establish that the statement in question constituted deficient performance or that such resulted in prejudice.

### C.    Trial Counsel - Remaining Claims

Petitioner asserts that his trial counsel rendered ineffective assistance by: (1) requesting that the jury be instructed on the defense of accident and (2) failing to move for directed verdict. The Court fails to discern how it constitutes deficient performance for an attorney to request an instruction concerning a defense which is arguably supported by the evidence presented. Moreover, even if it is assumed that counsel's action was deficient, Petitioner cannot establish that he was prejudiced by such. As for Petitioner's argument that his attorney should have moved for a directed verdict, as discussed above the prosecution presented sufficient evidence to convict Petitioner. It is unreasonable to assert that a motion for directed verdict would have been granted. Accordingly, even if it did constitute deficient performance to fail to ask for a directed verdict,

Petitioner's claim fails because he cannot established that he was prejudiced as a result.

Petitioner's claims that his trial counsel rendered ineffective assistance were rejected by the Michigan courts. This decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Furthermore, such was not based on an unreasonable determination of the facts in light of the evidence presented. Thus, this claim raises no issue on which habeas relief may be granted.

D.    Appellate Counsel

Petitioner asserts that his appellate counsel rendered ineffective assistance in the following ways: (1) failed to move for a new trial; (2) failed to move in the trial court for a *Ginther* hearing; (3) failed to assert on Petitioner's appeal the various errors made by trial counsel.

Petitioner has failed to establish that he was entitled to a new trial or that a *Ginther* hearing was necessary or would have inured to his benefit. Moreover, as discussed above, Petitioner has failed to demonstrate that his trial counsel made any errors that would have supported or likely resulted in appellate relief. Thus, even if the Court assumes that appellate counsel rendered deficient performance, Petitioner cannot establish that he was prejudiced thereby.

Petitioner's claims that his appellate counsel rendered ineffective assistance were rejected by the Michigan courts. This decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law. Furthermore, such was not based on an unreasonable determination of the facts in light of the evidence presented. Thus, this claim raises no issue on which habeas relief may be granted.

**VII.** **Cumulative Effect  (Habeas Claim IX)**

Finally, Petitioner asserts that he is entitled to habeas relief based on the "cumulative effect" of the various errors which occurred during his trial.  First, Petitioner has failed to identify any errors or violations of federal law which occurred during his trial.  Furthermore, as the Sixth Circuit has made clear, habeas relief cannot be premised upon an alleged accumulation of errors. *See Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005).


## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Williams' petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  April 12, 2013 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge